UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :
UNITED STATES OF AMERICA,                                           :
                                                                    :
                                                                    :
            -v-                                                     :   23 Cr. 561 (JPC)
                                                                    :
                                                                    :   FINDINGS OF FACT AND
IVANJOEL ARYEETEY,                                                  :   CONCLUSIONS OF LAW
                                                                    :
            Defendant.                                              :
                                                                    :
------------------------------------------------------------------- X

JOHN P. CRONAN, United States District Judge:

Defendant Ivanjoel Aryeetey, who is charged with being a felon in possession of a firearm, moves to suppress evidence stemming from New York City Police Department ("NYPD") officers' pursuit of him on September 5, 2023.  This pursuit began as an attempted traffic stop—when the officers purportedly observed Aryeetey driving without a seatbelt—and culminated in a foot chase—after Aryeetey crashed his car into two other vehicles, climbed out of the window, fled by foot, and eluded capture.  Aryeetey argues that he was seized for purposes of the Fourth Amendment when his car was stopped in the three-car collision, and, attesting under the penalty of perjury that he was wearing his seatbelt that day, urges that the officers lacked reasonable suspicion to effectuate a seizure.  Having conducted an evidentiary hearing on the motion, assessed the credibility of the witnesses, and applied the relevant law, the Court sets forth the following findings of fact and conclusions of law.  For the reasons discussed below, the Court denies the motion.

## I. Procedural Background

### A.   Prior Racketeering Conviction

In December 2016, Aryeetey pleaded guilty to Count Four of the S2 Superseding Indictment in *United States v. Burrell et al.*, No. 15 Cr. 95 (AJN) (S.D.N.Y.) ("2015 Matter"), and allocuted to brandishing a firearm, and aiding and abetting the same, in connection with racketeering and narcotics conspiracies, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). 2015 Matter, Dkts. 97, 930. In May 2017, the Honorable Alison J. Nathan, to whom Aryeetey's case was then assigned, sentenced Aryeetey to eighty-four months' imprisonment and a three-year term of supervised release. *Id.*, Dkt. 1348. In November 2019, following the Supreme Court's decision in *United States v. Davis*, 588 U.S. 445 (2019), Aryeetey moved to vacate his conviction under 28 U.S.C. § 2255. 2015 Matter, Dkt. 2688. In June 2020, Aryeetey's plea was vacated, and Aryeetey pleaded guilty to Count One of the S14 Superseding Information charging him with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d). *See id.*, Dkts. 2906, 2913. The next month, Judge Nathan sentenced Aryeetey to sixty months' imprisonment and a three-year term of supervised release. *Id.*, Dkt. 2925. At the end of his custodial term on July 26, 2021, Aryeetey was transferred to the custody of Immigrations and Customs Enforcement and released on February 1, 2022, marking the commencement of his supervised release term. *See* Dkt. 6 at 1-2.

Events alleged to have transpired on September 5, 2023 underlie both a violation of supervised release proceeding in the 2015 Matter and the subsequent indictment in this case charging Aryeetey with being a felon in possession of a firearm.

### B.   Alleged Violation of Supervised Release

In April 2022, Aryeetey's case in the 2015 Matter was transferred to the undersigned. In connection with that case, on October 5, 2023, the Court issued an arrest warrant at the request of

2

the United States Probation Office, which had learned of the September 5, 2023 events just the day before. *See* Dkt. 19 ("Opposition") at 6-7; 2015 Matter, Dkt. 3512 at 3:2-5. Also on October 5, the Court arraigned Aryeetey on the alleged violations of the terms of his supervised release. *See* 2015 Matter, Dkt. 3512 at 4:4-6:24. To gain entry to the courthouse for that October 5 appearance, Aryeetey was required to surrender his three cellphones, which his probation officer subsequently recovered from courthouse security. *See* Opposition at 7.

**C.      Instant Criminal Matter**

On October 19, 2023, the Honorable James L. Cott authorized the Complaint charging Aryeetey with one count of knowingly possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1 ("Complaint"). The Complaint alleges that on September 5, 2023, an NYPD officer, riding with three other officers, observed the suspect (later identified as Aryeetey), accompanied by a female passenger, driving without a seatbelt in the vicinity of East 163rd Street and 3rd Avenue in the Bronx, New York. *Id.* ¶ 4(a). As further alleged, the officer activated his lights to stop Aryeetey's car, but Aryeetey continued driving until he crashed into a parked car; Aryeetey subsequently exited his car and fled on foot. *Id.* ¶ 4(b)-(c). According to the Complaint, an officer observed Aryeetey carrying a green bag as he fled, and a witness reported that Aryeetey had thrown such a bag over a fence during his flight. *Id.* ¶ 4(e), (g). Finally, the Complaint alleges that the officers recovered a loaded Taurus USA 9 mm pistol from that bag, and that after arresting the passenger and searching the vehicle, the officers recovered a probation identification card with identifying information for Aryeetey. *Id.* ¶¶ 4(h), 5(a).

On October 31, 2023, a federal grand jury returned an indictment charging Aryeetey with violating 18 U.S.C. § 922(g)(1). Dkt. 3. And on November 9, 2023, the Honorable Sarah Netburn approved a search warrant for the three previously recovered cellphones based on a finding of

probable cause that they contained evidence of the charged offense. *See* Opposition at 7. After initially being assigned to the Honorable J. Paul Oetken, the case was transferred to the undersigned on January 8, 2024. *See* Dkt. 7.

On January 17, 2024, Aryeetey moved to suppress "all evidence obtained in violation of the Fourth Amendment, including a firearm, Probation identification card, and cellphones that were recovered by law enforcement agents." Dkt. 14 (notice of motion); *see* Dkt. 15 ("Motion"). Aryeetey contends that the NYPD officers lacked reasonable suspicion to execute the traffic stop on September 5, 2023, attesting in an affidavit under the penalty of perjury that he was in fact wearing his seatbelt at that time. *See* Motion at 4-8; Dkt. 16 ("Aryeetey Affidavit") ¶ 4 ("A little before 5:30 p[.]m., I was driving north on Third Avenue in the Bronx, where I briefly stopped at a traffic light before turning left. Before the police lights started flashing, I was driving with my seatbelt on."). Aryeetey argues that any evidence seized pursuant to that incident must be suppressed "as fruit of the illegal traffic stop." Motion at 10.

The Government filed its opposition on February 5, 2024. Dkt. 19. The Government counters that the NYPD officers did not actually stop Aryeetey for purposes of the Fourth Amendment, and that, in any event: (1) Aryeetey abandoned the bag he was carrying (and thus the recovered firearm); (2) the NYPD officers had probable cause to search Aryeetey's vehicle based on their recovery of the subject firearm and observation of Aryeetey's flight, although they did not need such probable cause to conduct the routine inventory search; and (3) the three cellphones were properly seized as rationally related to the probation officer's duties. *Id.* at 11-17. Aryeetey replied four days later, insisting that an evidentiary hearing was necessary to resolve the pertinent issues. Dkt. 20 ("Reply").

4

The Court conducted an evidentiary hearing on April 8, 2024, after which the parties submitted their proposed findings of fact and conclusion of law. *See* Dkts. 36 ("Deft. Proposals"), 37 ("Gov't Proposals"). In their post-hearing submissions, the parties primarily address (1) whether Aryeetey was seized within the meaning of the Fourth Amendment on September 5, 2023 and (2) whether the police had reasonable suspicion to initiate that traffic stop. The Government further reiterates its arguments on Aryeetey's abandonment of the firearm. *See* Gov't Proposals at 11-12.

Finding that Aryeetey was not seized, the Court sets forth only those factual findings upon which it relied to arrive at this dispositive conclusion, *see* Fed. R. Crim. P. 12(d), and only those legal conclusions necessary to resolve Aryeetey's motion.

## II.  Findings of Fact

At the April 8, 2024 suppression hearing, the Government called NYPD Officers Peter Delohery and Stephen Oswald, who have served in the 40th Precinct for five and eight years, respectively. Dkt. 33 ("Tr.") at 7:5-7, 59:14-20. The Government also introduced these officers' body-worn camera ("BWC") footage from their September 5, 2023 pursuit of Aryeetey, depictions of the geographic area where this pursuit occurred, and surveillance footage taken from a nearby building. *See id.* at 13:21-25 (Government Exhibits 6 through 9 received), 18:10-11 (Government Exhibit 1 received), 58:23-24 (Government Exhibit S1 received), 67:22-24 (Government Exhibits 2 and 3 received), 75:9-14 (Government Exhibits 4 and 5 received). Aryeetey, who had submitted an affidavit and various other exhibits in connection with his motion to suppress, *see generally* Dkt. 16, called no witnesses at the hearing but introduced additional evidence while cross-examining the officers. *See* Tr. at 25:4 (Defense Exhibit 12 received), 30:21-25 (Defense Exhibit

12A received), 37:15 (Defense Exhibit 13 received), 43:2-3 (Defense Exhibit 2 received), 46:20-21 (Defense Exhibits 6 and 7 received), 76:19-21 (Defense Exhibit 10 received).

Having considered the evidence submitted by the parties and having observed the officers' demeanor during the hearing, the Court credits the officers' testimony and finds that the Government has proven the following facts by an evidentiary preponderance. *Cf. United States v. Flores*, No. 99 Cr. 1110 (RWS), 2000 WL 1597880, at *2 (S.D.N.Y. Oct. 27, 2000) ("Once the defendant has established some basis for the motion [to suppress], the burden shifts to the government to show that the search was lawful." (citing *United States v. Sacco*, 563 F.2d 552, 558 (2d Cir. 1977)), *on reconsideration*, 122 F. Supp. 2d 491 (S.D.N.Y. 2000).

On Tuesday, September 5, 2023, Officer Delohery was driving an unmarked NYPD patrol car (the "Patrol Car")—with Officer Oswald in the passenger seat and two other officers in the back—in the vicinity of the intersection of Third Avenue and East 163rd Street in the Bronx, New York. Tr. at 32:10-21, 83:11-12. While stopped at that intersection and facing east, Officer Delohery observed a gray Honda sedan (the "Honda") that had been "traveling northbound on Third Avenue make a left turn to travel westbound on 163rd Street." *Id.* at 14:20-21. Officer Delohery told the other officers in the Patrol Car that the Honda's driver—later determined to be Aryeetey, *see* Aryeetey Affidavit ¶ 3—was not wearing a seatbelt. Tr. at 32:7-15, 63:21-64:1.

Officer Delohery then made a U-turn to position the Patrol Car behind the Honda and began to follow the Honda westbound on 163rd Street. *Id.* at 50:1-22; *see* Gov't Exh. 2 (Officer Oswald's BWC footage showing the Patrol Car beginning to turn at timestamp 17:27:35). Approximately thirteen seconds after he initiated this pursuit, Officer Delohery activated the Patrol Car's lights and sirens. Tr. at 14:24-15:7, 64:15-18; *see* Gov't Exh. 2 (Officer Oswald's BWC footage showing that the Patrol Car's lights were activated around timestamp 17:27:48). In response, Aryeetey

accelerated, driving above the twenty-five-miles-per-hour speed limit.  Tr. at 14:25-15:2 (Officer Delohery testifying that after he activated his lights and siren on the Patrol Car in "an attempt to conduct a car stop," the Honda "did not stop, it accelerated"), 51:6-15 (Officer Delohery testifying that he was driving "pretty fast" and above the speed limit, which was "25," while pursuing the Honda), 64:21-65:3 (Officer Oswald testifying that after the activation of lights and sirens, the Honda "drove away from [the Patrol Car] at a high rate of speed" that was "well over the speed limit").  At no point during this pursuit did Aryeetey signal his intent to pull the Honda over by, for instance, decelerating or turning on his hazard lights.  *Id.* at 20:1-2 ("A [Delohery]: I never saw any indication that [the Honda] was attempting to pull over."), 20:3-4 ("Q [Government]: When did the driver put on his hazard lights? A [Delohery]: Never."), 20:5-7 ("Q [Government]: Based on your training and experience, when did it occur to you that the driver intentionally decelerated? A [Delohery]: He never intentionally decelerated."), 68:24-69:1 ("Q [Government]: After you put on your lights and sounded your siren, when did the gray Honda decelerate? A [Oswald]: Not until it crashed into another vehicle.").

Less than a minute after Officer Delohery activated his lights and sirens, the Honda came to a stop, colliding with the rear of a red car, which sustained only minimal damage, and the passenger side of a white car, which was parked on the side of the road.  *Id.* at 53:4-8, 68:24-69:1; Gov't Exh. 2 (Officer Oswald's BWC footage at timestamp 17:28:35 showing the Honda stopped near the red and white cars); Deft. Exh. 2 (Officer Delohery's BWC footage showing superficial damage to red car after the collision); *see* Tr. at 43:15:15-17 ("Q [Defense Counsel]: Looking at the video, would you agree with me that there is only very minor damage to the red car? A

[Delohery]: It appears to be minor damage.").[1]  As a result of the collision, the driver's side door of the Honda was pinned against the front passenger door of the white car such that the driver's side door of the Honda could not be opened.  *See* Gov't Exh. 1 (showing the cars' arrangement at timestamp 17:28:44).

At the moment the Honda came to a stop, Aryeetey climbed out of the driver's side window and fled the scene on foot.  Tr. at 21:4-7, 69:11-16.  Officer Oswald exited the Patrol Car as it was coming to a stop behind the Honda and ran after Aryeetey.  *Id.* at 69:17-70:2; *see* Gov't Exh. 2 (Officer Oswald's BWC footage showing Officer Oswald exiting the moving Patrol Car at timestamp 17:28:30-17:28:33).  As Aryeetey fled from the officers, he threw a bag into a vacant construction lot.  *See* Gov't Exh. 4 (surveillance footage from nearby building).

As earlier mentioned, the Government contends that the officers subsequently recovered a loaded firearm from that bag and a probation identification card with identifying information for Aryeetey from the Honda.  Aryeetey was not apprehended that day.  Tr. at 70:3-4.

### III.  Conclusions of Law

Aryeetey argues that the officers seized him the moment the Honda was stopped, that they lacked reasonable suspicion to do so, and that, consequently, any evidence recovered thereafter must be suppressed as the fruits of an unconstitutional traffic stop.  Because Aryeetey was not seized, the Court denies the motion to suppress.

---

[1] Aryeetey argues that the minimal damage to the red car is inconsistent with the officers' testimony that Aryeetey sped away from the Patrol Car above the posted speed limit.  *See* Deft. Proposals at 10.  The Court disagrees, finding it plausible that a car driving faster than twenty-five miles per hour and colliding with a car in front of it could result in minimal damage to the other car.  Of course, the magnitude of any such impact would depend in part on the relative speed of the two vehicles at the time of the collision.  But no evidence on the speed at which the red car was moving was introduced.  Accordingly, the Court discerns no basis to discredit the officers' testimony regarding Aryeetey's acceleration away from the Patrol Car or the speed at which he was driving.

The Fourth Amendment proscribes unreasonable searches and seizures by the Government, U.S. Const. amend. IV, with its protections extending to brief investigatory stops, *Terry v. Ohio*, 392 U.S. 1, 9 (1968). Under the Fourth Amendment's strictures, an officer may conduct such an investigatory stop only if at the time the officer effects the stop, the officer has "a reasonable suspicion that criminal activity is afoot." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007). "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013). Rather, the "stop must be 'justified at its inception.'" *Id.* (quoting *Terry*, 392 U.S. at 20). Accordingly, to determine whether there was reasonable suspicion for a *Terry* stop, a court must first determine the precise moment the *Terry* stop was effectuated—*i.e.*, the moment the "seizure" occurred. *See Terry*, 392 U.S. at 21-22 ("And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

A seizure within the meaning of the Fourth Amendment occurs in one of two ways. First, a seizure by force occurs when an officer applies physical force to the body of a person with the intent to restrain that person. *See Torres v. Madrid*, 592 U.S. 306, 311 (2021). Such an application of force constitutes a seizure, even if the officer ultimately fails to secure control over the person. *Id.* Second, in the absence of physical force, a seizure by acquisition of control involves "either voluntary submission to a show of authority or the termination of freedom of movement." *Id.* at 322. Unlike in the case of seizure by force, "actual control is a necessary element for this type of seizure." *Id.*

Aryeetey principally argues that he submitted to the police's display of authority the moment he "pulled over"—that is, when the Honda was stopped in a collision with two other cars. Motion at 8-10; Deft. Proposals at 17-19. "Whether conduct constitutes submission to police authority will depend on the totality of circumstances—the whole picture." *United States v. Huertas*, 864 F.3d 214, 216 (2d Cir. 2017) (ellipsis removed and internal quotation marks omitted); *see also Brendlin v. California*, 551 U.S. 249, 262 (2007) ("[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away."). "Of particular relevance here, conduct that amounts to evasion of police authority is not submission." *Huertas*, 864 F.3d at 216 (brackets removed and internal quotation marks omitted).

In his version of "the whole picture," Aryeetey portrays the three-car collision as an earnest attempt on his part to comply with police orders, urging that "he struggled to navigate" the "narrow street with multiple double-parked cars" and "got into a minor collision as he tried to find a safe place to pull over." Deft. Proposals at 8; *see also* Aryeetey Affidavit ¶ 5 ("Less than a minute later, I realized the police meant for me to stop, I knew I could not just keep driving and had to pull over. Then I pulled over."). Initially, the Court finds incredible Aryeetey's euphemistic depiction of the collision, which is difficult to reconcile both with his initial acceleration away from the police before the collision and his flight thereafter. In any event, it makes no difference here whether Aryeetey stopped the Honda voluntarily because he realized he was being pulled over or involuntarily from colliding with two other cars. Under either account, Aryeetey's conduct did not amount to submission to police authority.

The Second Circuit's decision in *United States v. Baldwin* is instructive, if not dispositive. In *Baldwin*, the defendant pulled his car over after police officers, who were positioned behind him in a marked patrol car, activated their lights and sirens. 496 F.3d 215, 217 (2d Cir. 2007). The officers then exited their patrol car and approached the defendant's car. *Id*. They ordered the defendant twice to show his hands and drew their weapons when the defendant ignored their commands. *Id.* As they approached the defendant's car, the defendant sped off. *Id.* In determining that the defendant had not been seized the moment he stopped his car, the Second Circuit held:

> [T]o comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for "there is no seizure without actual submission[.]"

*Id.* at 218 (quoting *Brendlin*, 551 U.S. at 254). Even accepting Aryeetey's narrative, he similarly did nothing more than "halt temporarily" when he "pulled over" on September 5, 2023.

Aryeetey attempts to distinguish *Baldwin*, positing that the defendant there had "stopped his vehicle in response to an order . . . to put the police at a disadvantage in a chase," Deft. Proposals at 17, and urging that the holding is limited to situations where the defendant's momentary stop was "part of a ruse to escape," Reply at ii. But the Second Circuit has explicitly rejected such a narrow reading, making clear that its holding in *Baldwin* did not in fact "depend[] on a plan or design to flee that is formed before the defendant feints at submission," given that "suspects often act on opportunity and impulse rather than calculation." *Huertas*, 864 F.3d at 218. Instead, as the Second Circuit announced, "the principle of *Baldwin* is not fact-limited" and, "[s]ubject to the specific circumstances of each case, submission is questionable when a suspect remains out of reach and takes flight when police move to lay hands on him." *Id.*

Accordingly, Aryeetey's stopping the Honda—regardless of whether it was done voluntarily and without any intention of gaining a tactical advantage over the police in his

11

subsequent flight—does not compel the conclusion that he submitted to police authority. Rather, that temporary break must be considered in the totality of circumstances. Here, the Government has shown that Aryeetey accelerated away from the officers when they activated their lights and sirens, and that *the very moment* the Honda stopped in a three-car collision, Aryeetey climbed out of the window and fled the scene by foot. *See supra* II. Significantly, given the celerity with which Aryeetey exited the Honda, the officers never came within reach of Aryeetey. *Cf. Huertas*, 864 F.3d at 217 (holding that a defendant, who momentarily paused and talked to a police officer before running away, had not submitted to police authority, and explaining that "[a]mong the significant circumstances are the brevity of interaction and the fact that [the officer] was never within reach of [the defendant] and able to physically restrain him"). In these circumstances, Aryeetey's course of conduct amounted to evasion of police authority—not submission.

Next, Aryeetey contends that he was "seized by force" because he was blocked in by the two cars—one to his front and one to his side (notably, circumstances of his own doing)—and by the Patrol Car that soon thereafter pulled up behind him. Deft. Proposals at 19 (section captioned "Aryeetey Was Seized by Force When Officers Blocked His Car"). In so arguing, he appears to conflate a seizure through termination of freedom of movement with a seizure by force—neither of which occurred here.

A seizure by termination of freedom of movement requires that a suspect "be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Torres*, 592 U.S. at 322 (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)). As emphasized by the Supreme Court, "actual control is a necessary element for this type of seizure." *Id*. The facts in *Brower v. County of Inyo* provide a "prime example" of a seizure through the termination of freedom of movement. *Id.* There, the Supreme Court held that the police "seized" a driver when

he crashed into a police roadblock, which is "designed to produce a stop by physical impact if voluntary compliance does not occur." *Brower*, 489 U.S. at 598. And in a similar vein, the Second Circuit has found that a seizure occurred where a police officer, in a marked police car with activated lights, pulled up behind a suspect's parked car, "thereby effectively blocking her movement." *Pane v. Gramaglia*, 509 F. App'x 101, 103 (2d Cir. 2013).

Here, the police did not seize Aryeetey through the termination of his freedom of movement because he did not come within their actual control; he ran away. In other words, the officers' show of authority failed to *effectively* terminate his movement. *Cf. United States v. Krubally*, No. 20 Cr. 616 (NSR), 2021 WL 2000394, at *4 (S.D.N.Y. May 19, 2021) (explaining that even if the officers' blocking of the defendant's vehicle constituted a seizure of those passengers who remained in the blocked vehicle under *Pane*, "it certainly did not constitute a seizure of [the d]efendant because [the d]efendant immediately exited" the vehicle); *see also United States v. Ross*, No. 21 Cr. 571 (BCM) (LB), 2023 WL 6160436, at *5-6 (E.D.N.Y. July 31, 2023) (finding that "the officers' conduct—shooting at [the defendant] from multiple directions to prevent him from escaping and blocking his exist from the courtyard—constitute[d] a seizure by acquisition of control" because "the officers' show of authority effectively terminated [the defendant]'s movement"), *report and recommendation adopted*, 2023 WL 6158840 (E.D.N.Y. Sept. 21, 2023).

In contrast to seizures by acquisition of control, whether through voluntary submission or termination of the freedom of movement, seizures by force can occur "even if the person does not submit and is not subdued." *Torres*, 592 U.S. at 325. Still, Aryeetey's arguments fare no better under a seizure-by-force theory because such seizures strictly contemplate the application of force to the *body* of the suspect. *Cf. California v. Hodari D.*, 499 U.S. 621, 625 (1991) ("[The present

13

case] does not involve the application of any physical force; [the defendant] was untouched by [the officer] . . . .").

The contours of a seizure by application of force are informed by the common law of arrest—described by Supreme Court as the "quintessential seizure of the person under [] Fourth Amendment jurisprudence," *Torres*, 592 U.S. at 311 (internal quotation marks omitted)—which seemingly could entail even the most benign corporal contact. *See Hodari D.*, 499 U.S. at 624-25 (interpreting "seizure" by consulting the common law of arrest). Indeed, under the common law, "[t]he touching of a person—frequently called a laying of hands—was enough" to accomplish an arrest. *Torres*, 592 U.S. at 313 (citing *Dunscomb v. Smith*, Cro. Car. 164, 79 Eng. Rep. 743 (K. B. 1629)). Guided by this principle, the Supreme Court held that a woman who eluded capture after the police shot her, was nonetheless "seized" within the meaning of the Fourth Amendment "for the instant that the bullets struck her." *Torres*, 592 U.S. at 318. Although it recognized "that the common law limited arrests by force to the literal placement of hands on the suspect," the Supreme Court explained that "the required 'corporal seising or touching the defendant's body' can be as readily accomplished by a bullet as by the end of a finger." *Id.* at 316 (quoting 3 W. Blackstone, Commentaries on the Laws of England 288 (1768) (Blackstone)).

In Aryeetey's case, however, the requisite corporal contact—whether by a laying of hands or otherwise—is plainly absent. Accordingly, Aryeetey was not seized by force.[2]

The only argument that Aryeetey advances to suppress evidence—whether it be evidence recovered on September 5, 2023, such as the bag containing the firearm and items found in the

---

[2] Aryeetey contends that the Government waived its arguments against his strained seizure-by-force theory for failing to address it in its Opposition. Deft. Proposals at 12-13. But where the claim "is meritless, there is nothing for the government to waive." *United States v. Shine*, No. 17 Cr. 28 (FPG) (JJM), 2018 WL 4627137, at *2 (W.D.N.Y. Apr. 9, 2018) (internal quotation marks omitted).

Honda including Aryeetey's probation identification card, or evidence obtained from the cellphone searches—is based on a "fruits of the poisonous tree" theory relating to the allegedly unlawful seizure on September 5, 2023.  *See* Deft. Proposals at 20; *see also* Tr. at 104:19-22 (defense counsel confirming that Aryeetey is challenging the searches of the cellphones on the basis that the evidence from those searches were fruits of an unlawful seizure).   The Court's determination that Aryeetey was not seized thus compels the denial of Aryeetey's motion to suppress in its entirety. The Court need not reach the parties' remaining arguments, including whether the officers had reasonable suspicion to attempt to stop Aryeetey in the first instance.

## IV.  Conclusion

For the foregoing reasons, the Court denies Aryeetey's motion to suppress.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 14.

SO ORDERED.

Dated: May 23, 2024  
New York, New York

_____  
JOHN P. CRONAN  
United States District Judge