

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 12, 2024

**BY ECF**

The Honorable John P. Cronan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

If Defendant opposes the Government's supplemental motion *in limine* contained in its letter filed October 11, 2024, Dkt. 57, Defendant shall file his opposition no later than Friday, October 18, 2024. In that filing, Defendant shall also indicate any objection to the filing under seal of Exhibits B, B-T, C, and C-T. Those Exhibits are provisionally filed under seal until further order of the Court.

SO ORDERED
October 15, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge

**Re: *United States v. Aryeetey*, 23 Cr. 561 (JPC)**

Dear Judge Cronan:

    The Government writes in opposition to the defendant's supplemental motion *in limine*, filed October 7, 2024, (Dkt. 56), regarding recent events within the New York City Office of the Chief Medical Examiner ("OCME"); and to move *in limine* to admit certain statements of an eyewitness.

    Regarding the OCME, as the Court is aware, the Government may offer evidence at trial concerning the OCME's comparison of DNA samples obtained from the defendant with samples obtained from the firearm seized in this case.[1] As described in greater detail below, the Government recently became aware—and promptly disclosed to defense counsel—that, over the last few months, there have been several instances in which DNA testing at the OCME laboratory resulted in contaminated evaluations. Although there is no reason to believe that these instances have any connection to the DNA testing performed in this case, the defendant nonetheless moves—without providing any basis in caselaw or the Federal Rules of Evidence—to "cross-examine any OCME criminalist witness on this subject." (*See* Dkt. 56 at 2). Because such examination would flout *Daubert* and is not admissible under the Federal Rules of Evidence, the Court should deny the defendant's motion.

    As to the eyewitness statements, the Government intends to offer at trial statements of a witness—whether or not the witness testifies—which were recorded on New York City Police Department ("NYPD") body-worn camera footage. Because the statements qualify as excited

---

[1] The Government understands that the OCME has already completed at least part of its testing, but has not yet completed its report in this case. If the report becomes available to the Government in advance of trial, the Government will promptly disclose it to the defense and provide notice of an appropriate expert witness "sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence." Fed. R. Crim. P. 16(a)(1)(G)(ii). This letter assumes that any such report would be otherwise admissible under Rule 702.

utterances, they satisfy an exception to the rule against hearsay.  *See* Fed. R. Evid. 803.  And because the statements were made amid an emergency, they are not testimonial for the purposes of the Confrontation Clause.  *See Davis v. Washington*, 547 U.S. 813, 828 (2006).  The Court should therefore grant the Government's motion.

## I. The OCME

### A. Relevant Facts

The Government recently obtained copies of two letters (collectively, the "Letters") describing a Root Cause Analysis ("RCA") currently underway at the OCME.[2]  (Dkt. 56, Ex. A ("RCA Letter-1")).  The purpose of an RCA is to examine recently identified cases in which DNA samples were contaminated during OCME analysis.  RCA Letter-1 described four contamination events that occurred in June 2024 and July 2024, involving three criminalists and eight cases.  The letter explained that the OCME was conducting a review of other evidence examinations conducted between May 1, 2024, and August 9, 2024, to determine whether any other cases were affected by contamination.  The Government received a second letter ("RCA Letter-2", Ex. A) on or about October 7, 2024, which provided additional updates regarding OCME's internal investigation.[3]  That letter indicated that additional contamination events had been identified, involving a total of nine criminalists and 22 cases between May and August 2024.  The OCME's investigation has reviewed more than 12,000 samples involved in nearly 4,000 cases.

The Government understands that the criminalist conducting DNA analysis in this case is not one of the nine criminalists whose DNA examinations were contaminated.  Moreover, the DNA testing in this case did not even begin until after August 9, 2024, *i.e.*, outside the timeframe the OCME is currently reviewing as part of the RCA, which the Government understands is intentionally broad out of an abundance of caution.

### B. Applicable Law

Under Federal Rule of Evidence 401, evidence is relevant when it has "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401 (describing relevancy's independent requirements that evidence be both probative and material, respectively); *see also* Fed. R. Evid. 402 (prohibiting the admission of irrelevant evidence).  Even where evidence is relevant, it may nevertheless be precluded if it fails the balancing test set forth in Rule 403.  Fed. R. Evid. 403.  Rule 403 provides that the Court may exclude relevant evidence where "[the evidence's] probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

---

[2] The Administrative Code of the City of New York requires OCME to update various stakeholders and conduct RCA reviews in a variety of situations.  *See* N.Y.C. Admin. Code §§ 17-207, 27-207.

[3] RCA Letter-2 was promptly disclosed to defense counsel on October 8, 2024.

Rule 611 provides that the "[c]ross-examination [of an expert witness] should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," but that the "court may allow inquiry into additional matters as if on direct examination." Fed. R. Evid. 611(b).

### C. Discussion

The Court should preclude the defense from raising the contamination events and OCME's associated investigation in jury arguments, cross-examination, or in any defense case.

To begin, direct evidence of OCME's ongoing investigation—whatever its tendency to make a fact more or less probable—is not material to any disputed issue at trial. *See* Fed. R. Evid. 401(b). The testing conducted in this case is not among the contamination events identified in the Letters; the criminalist involved in this case is not one of the criminalists identified in the Letters; and there exists no indication that there was anything improper about the procedures for the testing involved in this case. The testing in this case does not even fall within the broad scope of the OCME's retrospective review, a time period that was selected by OCME out of an abundance of caution. Although the defendant may cross-examine the OCME criminalist about the testing performed in this case to probe whether there is any evidence of contamination in this case, evidence about other, unrelated tests is not material. The Court should accordingly preclude any direct evidence regarding the RCA under Rules 401 and 402.

*Daubert* provides the proper framework to assess whether an expert's methodology is reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993). It is precisely because Rule 401's "basic standard of relevance . . . is a liberal one" that Rule 702 requires that expert evidence be not only relevant but also reliable, considering factors including:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citing *Daubert*, 509 U.S. at 593) (internal citations omitted). These long-established rules regarding expert testimony already expressly account for the possibility of errors. It is for the district court to make a "preliminary assessment of whether the reasoning or methodology underlying [expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," and then it is for the jury to assign the proper weight to that evidence. 509 U.S. at 593.

Here, however, the defendant does not propose to call his own expert witness at trial, to cross-examine an OCME expert regarding the reliability of their scientific methods, or even to cross-examine an OCME expert regarding their adherence to those methods in this case. Instead, the defendant seeks to subvert the *Daubert* framework altogether by using specific instances of

irrelevant conduct to attack the general reliability of otherwise admissible expert evidence. But without more, individual instances of error disconnected from the facts at issue in the case at hand cannot undermine scientific methodologies in general. Rather, the only conceivable purpose of such evidence is to advance the impermissible inference that, because other criminalists within the OCME made testing errors in the past, the testifying criminalist is more likely to have made a testing error in this case.

That the defendant proposes at this stage to raise the OCME investigation on cross-examination, rather than as direct evidence, does nothing to alter its admissibility. Rule 611 provides that the scope of expert cross-examination should extend only to "the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). But the Government's expert did not have involvement with any contamination events and therefore cannot testify about them, and no such matters conceivably affect the witness's personal credibility. Although the rule allows for "inquiry into additional matters as if on direct examination," such examination is generally confined to "facts and data underlying the expert's opinion that were not disclosed on direct" or the effect of hypothetically changed conditions. 1 McCormick On Evid. § 17 (2022); *see also* Fed. R. Evid. 705 (permitting requiring an expert to disclose underlying facts or data on cross-examination).

Indeed, the Second Circuit and other courts in this Circuit have precluded evidence of an expert witness's own prior errors, which were being offered to argue that the expert witness had a propensity for committing such errors. For example, the Second Circuit recently affirmed a district court's exclusion of prior malpractice lawsuits against an expert medical witness where the proponent contended that the lawsuits would demonstrate a "pattern of inconsistency" and "discredit[] the doctor's testimony." *Iverson v. Surber*, 800 F. App'x 50, 52 (2d Cir. 2020). The Circuit observed that the evidence could not "merely be used to show that [the doctor] had a propensity for making errors." *Id.* Likewise, the court in *United States v. Donovan* recently declined to permit cross-examination of an OCME criminalist for prior individual errors made by that criminalist involving mis-testing a sample, failing to record units of weight, and using a machine calibrated outside its normal range. 577 F. Supp. 3d 107, 122 (E.D.N.Y. 2021). As compared to *Donovan*, the probative value here of cross-examining the OCME criminalist about the contamination events is diminished further because the potential errors were made by other criminalists.

To be sure, the defendant is free to cross-examine the testifying OCME criminalist about possible failures of DNA evidence, including the risks of human and other errors that can contribute to improper analysis. The defendant may also permissibly conduct cross-examination as to whether there is any reason to believe particular errors were made in this case. Indeed, cross-examination of expert witnesses routinely attacks "the strength of [] credentials, faults in [the] use of . . . a methodology, or [the] lack of textual authority for [an] opinion." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995); *see also Vermont Food Indus., Inc. v. Ralston Purina Co.*, 514 F.2d 456, 463 (2d Cir. 1975) ("The sufficiency of the [expert's] assumptions as well as the soundness of the opinion can be tested on cross-examination."); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) (JPC) ("To the extent the Defendants have any questions about the weight or the sufficiency of the evidence upon which [the proffered expert]

relied, or the conclusions generated therefrom, those questions can be asked on cross-examination.") (citation omitted).

At a minimum, proposed questioning regarding specific, recent, and high-profile [4] contamination events poses significant risk of confusing and misleading the jury. Most obviously, the jury might (wrongly) conclude that the RCA implicates the DNA testing in this case, which it does not. *Cf. Bermudez v. City of N.Y.*, No. 15 Civ. 3240 (KAM) (RLM) 2019 WL 136633, at *9 (E.D.N.Y. Jan. 8, 2019) (excluding, in Section 1983 action, evidence of misconduct committed by unrelated officers under Rule 403); *Howell v. Keeton*, No. 16 Cr. 5877 BLF (PR), 2018 WL 10455908, at *11 (N.D. Cal. Apr. 3, 2018) (excluding evidence of unrelated contamination events in same lab and reasoning as follows: "And while both crimes were committed in Santa Clara County and both involved the Crime Lab, the criminalists were not the same.  In short, the only matters of commonality between the two cases were the county, the Crime Lab, and a theory— unproven in each case—of possible contamination in the field of the DNA sample linking the suspect to the crime.  Thus, the offer of proof presented nothing more than anecdotal evidence of the possibility of a DNA sample's contamination in an unrelated Santa Clara County criminal case."). Further, the RCA is still ongoing and the cause of the contamination events is not known. Evidence and argument concerning the RCA would cause the jury to improperly speculate as to the cause of disconnected contamination events. *Cf. United States v. Morel*, 751 F. Supp. 2d 423, 431–35 (E.D.N.Y 2010) (precluding evidence of prior declinations of prosecution under Rule 403 as it would call for improper speculation). In addition, introducing evidence of an RCA would mislead the jury without also introducing evidence of the statutory regime that requires the OCME to conduct RCAs and to make notifications to various stakeholders.  Without this context, the jury may place improper emphasis on the existence of an RCA.  Accordingly, even if some articulable basis for admissibility otherwise existed, the evidence's probative value is more than outweighed by the risks of undue prejudice, confusing the issues, and misleading the jury.  The Court should therefore exclude it under Rule 403.

## II. Eyewitness Statements

### A. Applicable Law

Federal Rule of Evidence 803 provides that a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is "not excluded by the rule against hearsay." Fed. R. Evid. 803(2). "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998).  Even statements made hours after a stressful event may qualify as excited utterances. *See United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990). "[W]hile the hearsay exception for present sense impressions focuses on contemporaneity as the guarantor of reliability, and requires that the hearsay statement describe or explain the contemporaneous event or condition

---

[4] *See, e.g.,* Rocco Parascandola, *Sloppy lab work contaminates DNA samples; NYC Medical Examiner orders review*, New York Daily News, September 17, 2024, https://www.nydailynews.com/2024/09/17/sloppy-lab-work-contaminates-dna-samples-nyc-medical-examiner-orders-review/.

. . . the excited utterance exception is based on the psychological impact of the event itself, and permits admission of a broader range of hearsay statements—*i.e.* those that relate to the event." *Jones*, 299 F.3d at 112 n.3.

Statements made with the "primary purpose" "to enable police assistance to meet an ongoing emergency" are non-testimonial for the purposes of the Confrontation Clause. *Michigan v. Bryant*, 562 U.S. 344, 359 (2011).

**B.   Discussion**

The Court should admit portions of statements made by the passenger of the vehicle the defendant crashed before fleeing from the police. The statements, made shortly after the crash, (*See* Ex. B (video), Ex. B-T (draft transcript)), and then within about an hour later, (Ex. C (video), Ex. C-T (draft transcript)), were captured on body-worn camera footage by NYPD officers.[5] Both sets of statements should be admitted as exceptions to the rule against hearsay pursuant to Rule 803 because they constitute excited utterances. The latter statements, moreover, are not "assertions" within the scope of the hearsay rule in any event.

As to the first set of statements, the Government expects to introduce footage in which the passenger explains in shock that she had "literally just left" to get tacos with the man driving the car, and expresses regret that she let him drive. Apparently having a panic attack, the woman lays down in the back of a police car and is periodically unresponsive, repeatedly asking officers whether she can call her mom. She asks, "What just happened? Bro, this isn't real." The footage depicts the woman asking for water and stating that "I need to cry." A police officer asks whether she needs an ambulance. Amid evident panic, the woman explains the circumstances of the crash:

> [The defendant] was like, oh, [the police are] going to pull me over. I said, why? And then I looked over, I see he didn't have the seatbelt. Yeah. I was like, fuck you feel me? Like, just, I said it like going to the gas station and he was like, nah. Then he kept going because I'm saying like, you know, it's just a seatbelt ticket that's like 130, you know? I didn't think nothing of it. Yeah. He was like, nah, you would think everything is calm, you know? Then once you guys did the, you, you, he just like hit the corner and I'm like, yo, bro, what are you doing? Why don't you just pull over? It's just the, you know, like, it . . . can, can I call my mom? I need a . . . I'm sorry. Can I call my mom?

(Ex. B at 17:36:09). These statements directly relate to a startling event that the woman had just witnessed firsthand: the man who was driving her car suddenly fleeing from police, crashing into another vehicle, climbing out the driver-side window, and running down the street. Because the passenger made the statements under stress, near in time to the event, and concerning the event, the Court should admit the statements as excited utterances under Rule 803. The Court should similarly admit other portions of the witness's statements during the same period, as highlighted

---

[5] The Government respectfully requests that each video and their accompanying draft transcripts be filed under seal because they depict and identify witnesses.

in Exhibit B-T, which reflect, among other things, the identity of the driver and the passenger's surprise and duress at his behavior.

The Court should also admit certain statements the passenger made in the police car some time later, including those concerning her surprise that police may have found a gun that had been in her car. While riding to a nearby precinct, she asks, in response to the suggestion that a gun had been found, "Inside my car?" (*See* Ex. C at 18:13:03). Although the passenger's statements during this later period were some time more distant from the car crash and foot chase, courts routinely admit excited utterances in similar circumstances, and indeed, in circumstances involving much longer time lapses. *See, e.g.*, *Scarpa*, 913 F.2d at 1017 (affirming admission of statements made five or six hours after startling event); *Tocco*, 135 F.3d at 127 (same, where statements were made three hours after startling event); *United State v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003) (admitting as excited utterance gunshot victim's statement made to detective at hospital 40 minutes after shooting); *see also United States v. Ramos*, No. 22 Cr. 431 (LJL), 2023 WL 9002868, at *2 (S.D.N.Y. Dec. 28, 2023) (collecting cases). The passenger's question, in any event, is not an "assertion[] within the meaning of Rule 801." *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012); *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir.1990) ("An inquiry is not an assertion, and accordingly is not and cannot be a hearsay statement.").

Each set of statements, moreover, are non-testimonial under the Sixth Amendment because they were "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822. The defendant remained at large during both periods, and his location remained "unknown at the time." *Bryant*, 562 U.S. at 359; *see also Ramos*, 2023 WL 9002868, at *2 (concluding that victim statements recorded on body-worn camera footage after a robbery were non-testimonial).

Accordingly, the Court should admit the statements.

### III. Conclusion

For the foregoing reasons, the Court should deny the defendant's motion *in limine* and grant the Government's motion *in limine*.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Ryan T. Nees
William Stone
Sam Adelsberg
Assistant United States Attorneys
(212) 637-1595 / 2521 / 2494